IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on May 11, 2006

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. |
| Plaintiff, | : | Grand Jury Original |
| | : | |
| v. | : | VIOLATIONS: |
| | : | |
| | : | Conspiracy |
| SCOTT THOMPSON, | : | (18 U.S.C. §371) |
| | : | |
| Defendant. | : | |

### INDICTMENT

THE GRAND JURY CHARGES:

COUNT ONE (Conspiracy - 18 U.S.C. §371)

1. At all times relevant to this Indictment:

a. Natural gas was a commodity as defined in Title 7, United States Code, Section 1a(4), and flowed through pipelines that cross state lines, thereby affecting interstate commerce.

b. Williams Energy Marketing and Trading ("Williams"), a subsidiary of The Williams Companies, was located in Tulsa, Oklahoma. Williams traded a number of different commodities, including natural gas. Williams' natural gas trading group handled all transactions related to natural gas.

c. Platts, a division of the McGraw-Hill Companies, located in Washington, D.C., provided information to the energy industry through a variety of publications. These publications included *Inside FERC's Gas Market Report* ("*IFERC*"), which published first of the month

-1-

natural gas prices for dozens of locations, or "hubs," and *Gas Daily*, which provided detailed coverage of natural gas prices at interstate and intrastate pipelines and pooling points in major U.S. markets.

   d. *Inside FERC's Gas Market Report*, a publication based in the District of Columbia, was one of the primary indices used to price natural gas transactions. *IFERC* computed and published indices of the prices for natural gas at various hubs using primarily a volume-weighted average based on trading data submitted by energy companies. *IFERC* instructed natural gas traders, including those at Williams, to report only physical, fixed-priced, baseload deals negotiated during bidweek, the last trading days of the month, and to email this trading data to *IFERC* at their offices in the District of Columbia. Misreporting of either prices or volumes could alter the index prices published by *IFERC*.

   e. Financial trades of natural gas generally were entered into without either party to the transaction intending to make or take delivery of any natural gas. The parties to the financial trades, called "counter-parties," could agree to any price. Often, however, contract prices were tied to index prices, including those published by *IFERC*.

  2. The defendant, **SCOTT THOMPSON**, was an employee of the Williams Companies' Wholesale Natural Gas Trading department from approximately May 1999 through approximately March 2001. **THOMPSON** worked as a financial trader, meaning he primarily conducted financial transactions which were not intended to involve receipt or delivery of physical natural gas. Among other duties, **THOMPSON** reported trade information to gas publications, including *IFERC* and *Gas Daily*.

  3. DARYL RUSSEL BROWN**,** BRION SCOTT McKENNA and THOMAS

-2-

JEFFERSON POOL were also financial traders who worked with **THOMPSON** at Williams and remained at Williams after **THOMPSON** left the company.

4. From on or about January 1, 2000, until on or about February 24, 2003, in the District of Columbia and elsewhere, the defendant **SCOTT THOMPSON**, together with others known and unknown to the grand jury, did knowingly and wilfully conspire to commit offenses against the United States, that is:

    a. to manipulate and attempt to manipulate the price of any commodity in interstate commerce, to wit, natural gas, and knowingly deliver and cause to be delivered for transmission through interstate commerce by telegraph, telephone, wireless, and other means of communication false and misleading and knowingly inaccurate reports concerning market information and conditions that tend to affect the price of any commodity in interstate commerce, to wit, natural gas, in violation of Title 7, United States Code, Section 13(a)(2); and

    b. to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

5. The purpose of the conspiracy was to provide false trading information to *IFERC*, *Gas Daily* and other publications in order to influence or attempt to influence the price of natural gas, which was traded in interstate commerce, and thereby to enrich the defendant **THOMPSON** and/or Williams.

## MANNER AND MEANS

6. It was a part of the conspiracy that **THOMPSON** and others known and unknown to the grand jury would report false trade data, including false prices and volumes or

entirely fictitious trades, in order to influence or attempt to influence the published index price at certain natural gas trading hubs for the benefit of Thompson's and/or Williams' financial positions.

7. It was further a part of the conspiracy that **THOMPSON** and others known and unknown to the grand jury would survey other traders on the Williams trading floor to determine the index prices that would be most beneficial to Thompson's and/or Williams' physical and financial positions.

8. It was further a part of the conspiracy that **THOMPSON** and others known and unknown to the grand jury would prepare spreadsheets containing the false trade data and transmit the completed spreadsheets via interstate wire to *IFERC,* whose offices were located within the District of Columbia, for inclusion in its natural gas price publication.

9. It was further a part of the conspiracy that **THOMPSON** would instruct others known and unknown to the grand jury not to provide editors of the indices, including *IFERC*, information about counter-parties to the supposed trades in order to avoid detection of the false reporting.

10. It was further a part of the conspiracy that **THOMPSON** would instruct others known and unknown to the grand jury to assert falsely to editors from industry publications, including *IFERC*, that they had verified the reported trades on trade tickets and that Williams' corporate policy prevented disclosure of counter-parties, through whom the publications could have verified the trade data reported by **THOMPSON**, BROWN, McKENNA, POOL and others.

11. It was further a part of the conspiracy that **THOMPSON** would train natural gas traders at Williams, including McKENNA, to report false trading information to the indices in

order to benefit **THOMPSON**'s, **McKENNA**'s, and/or Williams' trading positions.

12. It was further a part of the conspiracy that **THOMPSON** would falsely deny the existence of and his involvement in false reporting at Williams to agents from the Federal Bureau of Investigation in order to further the purpose of the conspiracy and to cover up his and his co-conspirators' illegal acts.

## OVERT ACTS

13. In furtherance of the conspiracy, and to achieve its object and purpose, at least one of the following overt acts, among others, were committed in the District of Columbia and elsewhere:

14. In or about bidweek January 2000, **THOMPSON** prepared a spreadsheet containing false trading data and submitted it via interstate wire to *IFERC* in Washington, D.C., on behalf Williams.

15. On or about February 1, 2000, **THOMPSON** instructed his co-conspirators and others to confirm to a reporter from *IFERC* that the false trades he had reported had in fact been conducted by Williams.

16. On or about August 31, 2000, **THOMPSON** prepared a spreadsheet showing false trades purporting to reflect Williams' trading activity during the August 2000 bidweek. The spreadsheet included false trades that would benefit **THOMPSON**'s and/or Williams' financial positions in the market.

17. On or about August 31, 2000, **THOMPSON** transmitted the above-described spreadsheet containing false trading data via interstate wire from his office in Tulsa, Oklahoma, to *IFERC*'s offices in Washington, D.C., for inclusion in *IFERC's* September 2000 first of the

month index.

18. From on or about September 15, 2000, through on or about September 30, 2000, **THOMPSON** instructed his co-conspirator, McKENNA, to construct false trading reports for future submissions to industry publications, including *IFERC*, by considering **THOMPSON**'s and/or Williams' trading positions and the range of prices currently trading in the market in order to create false trade data that would skew the index in favor of **THOMPSON**'s and/or Williams' financial positions without raising concerns among *IFERC*'s reporters or editors.

19. On or about September 29, 2000, **THOMPSON** prepared a spreadsheet showing false trades purporting to reflect Williams' trading activity during the September 2000 bidweek. The spreadsheet included false trades that would benefit **THOMPSON**'s and/or Williams' financial positions in the market.

20. On or about September 29, 2000, **THOMPSON** transmitted the above-described spreadsheet containing false trading data via interstate wire from his office in Tulsa, Oklahoma, to *IFERC*'s offices in Washington, D.C., for inclusion in *IFERC*'s October 2000 first of the month index.

21. On or about September 29, 2000, **THOMPSON** transmitted or caused to be transmitted to *Gas Daily* the same false trading data described above.

22. Between on or about October 2, 2000, and October 4, 2000, **THOMPSON** instructed co-conspirator McKENNA to provide false information to a reporter from *Gas Daily*, specifically that McKENNA had reviewed the deal tickets for the reported trades, that the reported trades were legitimate and that McKENNA could not provide counter-party information to the reporter.

23. Beginning on or about approximately October 30, 2000, and continuing through at

least on or about December 31, 2001, McKENNA and others known and unknown to the grand jury reported false trading information to *IFERC* each month via interstate wire, as taught by **THOMPSON**, in order to benefit their and/or Williams' financial trading positions.

24. On or about February 24, 2003, **THOMPSON** met with two Federal Bureau of Investigation Special Agents and falsely claimed he did not supply false or misleading trading data to the indices and denied having instructed other traders at Williams to mislead reporters who called to verify the reported trades.

In violation of Title 18, United States Code, Section 371.

A TRUE BILL

_____
FOREPERSON


_____
STEVEN A. TYRRELL
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice


_____
ROBERTSON PARK
Assistant Chief, Fraud Section
Criminal Division
United States Department of Justice


_____
AMANDA L. RIEDEL
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice