## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No.: 1:06-CR-00288-RJL** |
| | ) | |
| **SCOTT THOMPSON** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

### DEFENDANT SCOTT THOMPSON'S MOTION TO COMPEL THE GOVERNMENT'S DISCLOSURE OF MATERIAL VOLUNTARILY DISCLOSED TO IT BY THE WILLIAMS COMPANIES, INC.

Defendant Scott Thompson, through counsel, respectfully moves this Court, pursuant to United States Constitution, Amendments V and VI, Federal Rule of Criminal Procedure 16(a)(1)(E)(i), and *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United Sates*, 405 U.S. 150 (1972), and their progeny, to compel the Government to produce to him information that is material to preparing his defense and that was provided to the Government by the Williams Power Company, Inc., formerly Williams Energy Marketing & Trading Co., and/or its parent company, The Williams Companies, Inc. ("Williams").  Defendant has reason to believe that Williams voluntarily disclosed the material to the Government as part of its efforts to avoid being charged in connection with the Government's investigation into natural gas reporting, and accordingly waived the right to assert any attorney-client privilege or work-product protection that may might otherwise have protected the information from disclosure.  Defendant has conferred with the Government in a good faith effort to gain the Government's consent, without success.  In support of this motion, Defendant submits the accompanying Statement of Points and Authorities.  A proposed Order is also attached.

Defendant respectfully requests an oral hearing on this motion.

Respectfully submitted,


___/s/ Philip T. Inglima_____
Philip T. Inglima (D.C. Bar No. 420119)
Adrian D. Mebane (D.C. Bar No. 467885)
Ann M. Mason (D.C. Bar No. 491902)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

Dated:  May 4, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Crim. No.: 1:06-CR-00288-RJL** |
| ) | |
| **SCOTT THOMPSON** ) | |
| ) | |
| **Defendant** ) | |
| ) | |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT SCOTT THOMPSON'S MOTION TO COMPEL THE
GOVERNMENT'S DISCLOSURE OF MATERIAL VOLUNTARILY
DISCLOSED TO IT BY THE WILLIAMS COMPANIES, INC.**

I.    <u>Background</u>

A.    **Posture of the Case**

Almost exactly four years after The Williams Companies, Inc. announced that it was

cooperating with various government agencies, on September 28, 2006, the Government

obtained an indictment of Mr. Thompson for a single count of conspiracy, in violation of 18

U.S.C. § 341, to manipulate gas prices and knowingly deliver and cause to be delivered false and

misleading and knowingly inaccurate reports, in violation of 7 U.S.C. § 13(1)(2), and to commit

wire fraud, in violation of 18 U.S.C. § 1343.  *See* Indictment, ¶ 1.  The indictment alleges that

during the relevant time frame industry publications, including *Inside FERC's Gas Market

Report* ("*IFERC*") and *Gas Daily*, published "natural gas prices" or "index" natural gas prices at

different locations in the country and that at least *IFERC* computed indices of prices based on

trading data submitted by energy companies.  *Id.*   The indictment further alleges that contracts

for financial trades of natural gas were "often . . . tied to index prices, including those published

by *IFERC*."  *Id.* at 2.  Mr. Thompson is alleged to have participated in a conspiracy to provide

false information to *IFERC* and *Gas Daily* on behalf of Williams "in order to influence or attempt to influence the price of natural gas . . ." *Id.* at 5.

Over the course of five status hearings, the Court has monitored the slow progress of discovery. As the Court is aware, Defendant has made many discovery requests and the Government has made certain productions. Defendant seeks the Court's intervention now because the parties are unable to agree on the Government's obligation to provide Defendant with highly probative information Williams voluntarily disclosed to the Government.

Defendant has requested that the Government produce to him the following otherwise discoverable information provided to it by Williams:

- materials relevant to Defendant's case;

- all documents recording, summarizing or reporting the substance of witness interviews and/or attorney proffers stemming from Williams' internal investigation relating to natural gas price reporting; and

- any legal or management findings arising from the internal investigation.

Defendant has requested that the Government provide this information to Defendant in whatever form it was received by the Government, *i.e.*, in documents, in written summaries, or as part of an oral proffer. This evidence is material to Mr. Thompson's defense, and is potentially exculpatory.

Defendant understands from the Government that it has in its possession material responsive to this request. The Government has indicated it will not produce such material unless ordered by this Court to do so in view of certain assertions by Williams at the time it made its disclosures to the Government.

### B.    Williams' Participation in the Government's Investigation

In 2002, the Federal Energy Regulatory Commission ("FERC"), Commodities Futures Trading Commission ("CFTC"), and the Department of Justice ("DOJ") began investigating several gas trading companies' practices in reporting gas prices to certain publications.[1]  In June of that year, Williams offered to provide FERC with data relating to its gas trading.[2]

On October 25, 2002, Williams announced that an internal review of its trading activities had revealed that some of its traders had reported inaccurate gas prices to certain publications.[3]  This announcement of "findings" suggests fact gathering and a likely paper trail.  In the October 2002 release, Williams added that its "review [was] being conducted in conjunction with the Commodity Futures Trading Commission's ongoing industry-wide investigation."[4]  Moreover, Williams stated that it had "informed the CFTC *and other governmental authorities* about its investigation and [would] *continue* to cooperate fully with those entities' inquiries and

---

[1] *See, e.g.,* Staff of the Fed'l Energy Reg. Comm'n, *Final Report on Price Manipulation in Western Markets: Fact Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, Docket No. PA02-2-000, at ES-1 (Fed. Energy Reg. Comm'n Mar. 2003), *available at* http://www.ferc.gov/industries/electric/indusact/wec.asp [hereinafter *Final Report*] (noting that investigation was a "yearlong" effort ).

[2] Paula Hall-Collins, et al., *Williams Volunteers to Provide FERC Gas Trading Data for Independent Review*, Williams Press Release (June 5, 2002) *available at* http://www.williams.com/newsmedia/2002/20020605_265.htm (referring to its "ongoing cooperation with FERC's investigation of electric and natural gas prices.").

[3] Kelly Swan, et al., *Williams Discloses Natural Gas Trade Reporting* Inaccuracies, Williams Press Release (Oct. 25, 2002) *available at* http://www.williams.com/newsmedia/2002/20021025_329.htm.

[4] *Id.*

investigations."[5]  FERC later noted that, subsequent to this release, Williams "engaged in dialogue with FERC."[6]

On November 8, 2002, Williams announced publicly that it had received a subpoena from the U.S. Attorney for the Northern District of California as part of a grand jury investigation. Williams stated that it would "cooperate with the U.S. Attorney's request, as it ha[d] with other government organizations inquiring into similar issues."[7]

In a report issued in 2003, FERC detailed a good deal of the information Williams' investigation had purportedly uncovered relating to inaccurate information provided by Williams traders to *Inside FERC*.[8]  The Report reiterated the rationales Williams employees gave (apparently to investigators) for allegedly "manipulat[ing] the data they provided to the *Inside FERC* spreadsheet," and described other things the traders had "stated."[9]  Moreover, it reported on the results of "an analysis of the financial positions of the Williams trading desks," also apparently conducted as part of the internal investigation.[10]

Williams has demonstrated a long history of cooperation with the Government, particularly by way of the disclosure of its "findings" in October of 2002 and its agreement in November of 2002 to comply, without objection, with a DOJ subpoena.  This history of

---

[5] *Id.* (emphasis added).

[6] *See Final Report*, *supra* note 1, at III-9 (noting Williams' announcement on October 25, 2002).

[7] Kelly Swan & Richard George, *Williams Will Respond to Government Inquiry*, Williams Press Release (Nov. 8, 2002) *available at* http://www.williams.com/newsmedia/2002/20021108_339.htm.

[8] *Final Report*, *supra* note 1, at III-9 to 10.

[9] *Id.* at III-10.

[10] *Id.*

cooperation, along with subsequent events, gives Defendant reason to believe that Williams' cooperation may have included the disclosure of documents, written witness statements or summaries of statements, and other relevant and material evidence.  Williams' cooperation may also have included oral descriptions of witness statements or of the content and significance of other evidence.  It is likely that some of this evidence may have been confidential attorney-client statements or attorney work-product.

On February 22, 2006, more than three years after Williams' announcement that it would cooperate with the Government, Williams entered into a formal cooperation agreement with the Fraud Section of DOJ and the Office of the United States Attorney for the Northern District of California, which had been jointly conducting investigations of practices in reporting gas prices to index publications.  *See* Exhibit A, Deferred Prosecution Agreement ("DPA").  In the DPA, the Government agreed that it would not prosecute Williams for matters discussed in the agreement (*i.e.*, the submission of false and inaccurate information to natural gas industry publications) in exchange for Williams' agreement to, among other things, fully cooperate in the continued investigation, and in the prosecution of others.   Exh. A: DPA ¶¶ 2 (noting Williams' "continuing commitment of full cooperation") and 5 (noting that Williams' "agreement to cooperate shall extend . . . [to] any investigations or prosecutions of others"); ¶¶ 10, 11.

The DPA confirms Williams' long history of cooperation with the investigation which has now led to Mr. Thompson's indictment, and only reinforces the view that Williams likely has disclosed to the Government materials to which Williams otherwise might claim privilege.  That same material has been used by the Government in its investigation and prosecution of Mr. Thompson.

II.    **The Court Should Compel Production of Materials Provided to the Government by Williams to Ensure Defendant's Right to a Fair Trial**

The Court should order the Government to comply with Defendant's discovery requests because Williams waived the right to assert any attorney-client privilege or work-product protection over such information by voluntarily producing it to the Government and, in any event, Defendant's discovery of these materials is essential to his fair trial rights.

A.    **Williams Waived Any Attorney-Client Privilege Over Information Provided to the Government**

The Court should order the Government to produce the requested materials notwithstanding any assertions by Williams of attorney-client privilege because Williams has waived that privilege.   "Any voluntary disclosure by the holder of such a privilege is inconsistent with the confidential relationship and thus waives the [attorney-client] privilege." *Permian Corp. v. United States*, 665 F.2d 1214, 1219 (D.C. 1981) (citing *United States v. AT&T*, 642 F.2d 1285, 1299 (D.C. 1980)).  By voluntarily producing such material to the Government as part of its cooperation with DOJ and with FERC, Williams implicitly waived any attorney-client privilege it might otherwise have claimed over the material.  *Id.*

In the DPA, Williams also *explicitly* waived the attorney client privilege, stating that its cooperation would include:

> Not asserting a claim of attorney-client or work-product privilege as to any documents, information, or testimony requested by the Fraud Section and/or USAO NDCal related to internal factual investigation or contemporaneous advice given to [Williams] concerning the conduct at issue.

Exh. A:  DPA ¶ 6(c).

Under the law of this circuit, waiver of the attorney-client privilege is not selective, meaning that a waiver as against the Government effected a waiver as against Defendant.  The U.S. Court of Appeals for the D.C. Circuit has stated:

6

> The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit . . . . The attorney client privilege is not designed for such tactical employment.

*Permian*, 665 F.2d at 1221 (rejecting holding of *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977)).  Williams' attempt to limit its waiver, by stating that it "neither expressly nor implicitly waives its right to assert any privilege with respect to the produced documents or the subject matter thereof that is available under law against non-parties" does not alter this conclusion.  *See* Exh. A: DPA ¶ 6(c).  Williams cannot assert the privilege to prevent Defendant from access to the information disclosed to the Government because Williams may not "invoke the privilege as to communications whose confidentiality [it] has already compromised for [its] own benefit."  *Id.* at 1221 (finding that Occidental's voluntary production to SEC as part of voluntary cooperation program waived any privilege in the material, *despite SEC's agreement to limit such material to its own use*, such that Occidental could not assert the privilege to prevent the SEC from producing the material to the Department of Energy).  *See also In re Subpoena Duces Tecum*, 738 F.2d 1367, 1370 (D.C. Cir. 1984) (holding that voluntary disclosure of attorney-client material to SEC waived privilege as to all, including class action plaintiffs).

Moreover, Williams cannot have had any realistic expectation that the information it disclosed to the Government would forever remain confidential, no matter what the Government agreed.  As stated above, Williams explicitly waived the attorney-client privilege as against the DOJ Fraud Section.  Exh. A:  DPA ¶ 6(c).  Williams also noted its "continuing commitment of full cooperation" and agreed, among other things, to "fully cooperate . . . regarding any matter about which [it] has knowledge" until the Fraud Section completes its investigation "relating to

false reporting concerning natural gas commodities, including any investigations *or prosecutions of others*." *Id.* ¶¶ 2, 5 (emphasis added).  These contractual covenants demonstrate that Williams expected that the Government might make use of this material in a trial, erasing any doubt that Williams' acts of waiver were inconsistent with any conscientious effort to preserve the confidential relationship.  Indeed, by the time the DPA was executed, FERC already *had* made public use of this material in its March 2003 report.  Williams bought peace with the Government, and the price included waiver of any privileges that it might previously have claimed for the facts and conclusions it assembled through its internal investigation.

Defendant's rights to a fair trial would be prejudiced by the finding of a selective waiver. In order to secure for itself a non-prosecution agreement and to assist the Government in prosecuting Defendant, Williams waived its privilege.  It cannot raise again that shield, after it intentionally and strategically lowered it.

Discovery in this matter to date has demonstrated how dependent the Government's trial case will be upon testimonial evidence.  Defendant has reason to believe that Williams' internal investigation entailed extensive witness interviews and fact gathering.  Statements, documents, recordings and data gathered through that process is essential to effective examination or cross-examination of witnesses called by the Government or the Defendant at trial.  Whether the content of information be explicitly exculpatory or of an impeachment value, it could prove dispositive in the context of such a trial.  *See, e.g., Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United Sates*, 405 U.S. 150 (1972).

**B.    Williams Waived Any Work-Product Protection Over Information Provided to the Government**

Williams waived any work-product protection regarding information it voluntarily disclosed to the Government as part of its cooperation and its efforts to dissuade the Government

from prosecution, without any reasonable basis for believing that the work-product would ultimately be kept confidential. In light of this reality and the fact that finding a waiver here would not undermine the policies that underlie the protection, the Court should order the Government to provide this information to Defendant.

The D.C. Circuit has identified three factors important to a finding of waiver:

> (1) the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege . . .; (2) appellants had no reasonable basis for believing that the disclosed materials would be kept confidential by the [third party]; and (3) waiver of the privilege in these circumstances would not trench on any policy elements now inherent in this privilege.

*The Navajo Nation v. Peabody Holding Co.*, 209 F. Supp. 2d 269, 286 (D.D.C. 2002) (citing *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1372 (D.C. Cir. 1984)). Ultimately, an "objective consideration of fairness" dictates whether a waiver should be found in a given case. *In re Subpoenas Duces Tecum*, 738 F.2d at 1371 (internal citation omitted).

First, by asserting the work-product protection against Defendant, Williams is attempting to use the doctrine in a way inconsistent with its purpose. The protection is intended to promote an attorney's preparation in representing his client in an adversary proceeding. *Id.* at 1371. Courts must balance this need against "society's general interest in revealing all true and material facts relevant to the resolution of a dispute." *Id.* Although "[a] disclosure made in pursuit of such trial preparation, and not inconsistent with maintaining secrecy against opponents, should be allowed without waiver of the privilege," disclosure to an opponent, in pursuit of leniency from that opponent, should not. *Id.* at 1371 (internal citation omitted) (finding that first factor weighed toward finding of waiver because party asserting privilege sought to keep from one adversary what had been disclosed to another, the SEC, as part of a voluntary disclosure program). In this case, by seeking to prevent Defendant from having access to material Williams

previously produced to the Government, the company is attempting to keep the documents out of the hands of some adversaries even though it has provided those documents, for its own benefit, to its government adversary.  As such, Williams is seeking greater advantage from its control over work product "than the law must provide to maintain a healthy adversary system."  *See id.* at 1372 (noting attempt of purported privilege-holder to keep documents from class plaintiffs though they had been produced to the SEC and DOJ); *In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982) (noting attempt to keep from grand jury the same documents the purported privilege holder had agreed to provide to the SEC).

Second, Williams had no reasonable basis to expect that whatever it disclosed to the Government would be kept confidential because it was aware that the Government might use the material in the prosecution of others.  Williams did not have any "common interest" with the Government when it made its disclosures.  *See In re Subpoena Duces Tecum,* 738 F.2d at 1372 (suggesting that such an interest *might* give reason to believe disclosures would remain confidential).  Even more importantly, Williams knew that the Government was apt to use the company's work-product to prosecute others, and learned at some point during its cooperation that FERC already *had* made use of it.  It acknowledged this likely use also in paragraph 5 of the DPA, and even agreed (in paragraph 6(c)) not to raise work-product protection in that eventuality.

Third, allowing the Government to share with Defendant what it received from Williams would not trench on any policy elements inherent in this protection.  Just as the D.C. Circuit has not carved out an exception to the general rules of work-product waiver for the SEC voluntary disclosure program, this Court should not carve one out for a DOJ deferred prosecution program, or for cooperation with the Government in general.  Both are "undoubtedly [made] in the hope

and expectation of receiving a benefit" out of such cooperation.  *See id.* at 1375 (discussing the

SEC program).  Ultimately, any "objective consideration of fairness" negates assertion of work

product protection in this case.  *See id.* at 1371 (internal quotations and citation omitted).

**III.    Conclusion**

    Having compromised its legal privileges and protections in order to compromise its legal

liability, Williams cannot now attempt to revive such privileges.  For the foregoing reasons and

such others as may be set forth at a hearing on this motion, Defendant's motion should be

granted, and Defendant should gain access to all information Williams yielded to the

Government in its pre- and post-DPA communications about this matter.


                                    Respectfully submitted,


                                      /s/ Philip T. Inglima
                                    Philip T. Inglima (D.C. Bar No. 420119)
                                    Adrian D. Mebane (D.C. Bar No. 467885)
                                    Ann M. Mason (D.C. Bar No. 491902)
                                    CROWELL & MORING LLP
                                    1001 Pennsylvania Avenue, NW
                                    Washington, DC  20004
                                    Telephone:  (202) 624-2500
                                    Facsimile:  (202) 628-5116

Dated:  May 4, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of May 2007, a true copy of the foregoing Defendant

Scott Thompson's Motion to Compel the Government's Disclosure of Material Voluntarily

Disclosed to It by The Williams Companies, Inc., Statement of Points and Authorities in Support

thereof, and accompanying Proposed Order were sent via electronic mail, to:

           Robertson Park, Assistant Chief
           Amanda L. Riedel, Trial Attorney
           U.S. Department of Justice
           Criminal Division, Fraud Section
           10th & Constitution Ave., NW
           Bond Building, 4th Floor
           Washington, DC 20530

                                  /s/ Adrian D. Mebane
                                 Adrian D. Mebane

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No.: 1:06-CR-00288-RJL** |
| | ) | |
| **SCOTT THOMPSON** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**ORDER**

Upon consideration of Defendant Scott Thompson's Motion to Compel the Government's Disclosure of Material Voluntarily Disclosed to it by the Williams Companies, Inc., the Government's responsive pleading, and the entire record, it is by the Court this _____ day of _____, 2007

ORDERED that Defendant's motion is GRANTED, and it is further

ORDERED that the Government shall produce to Defendant all evidence and argument of evidence communicated by Williams to the Government.

_____
HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

electronic copies to:

Philip T. Inglima, Esquire
Adrian D. Mebane, Esquire
Ann M. Mason, Esquire
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004


Robertson Park, Assistant Chief
Amanda L. Riedel, Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
10th & Constitution Ave., NW
Bond Building, 4th Floor
Washington, DC 20530

# Exhibit A

# AGREEMENT

Williams Power Company, Inc. ("WPC") formerly Williams Energy Marketing &

Trading Co. ("WEMT"), a Delaware Corporation and a wholly owned subsidiary of The

Williams Companies, Inc. ("Williams"), a Delaware Corporation, by its undersigned officer,

pursuant to authority granted by its Board of Directors, the United States Department of Justice

Fraud Section ("Fraud Section") and the United States Attorney's Office for the Northern

District of California ("USAO NDCal") enter into this Agreement in resolution of the Fraud

Section and the USAO NDCal's ongoing criminal investigation into the knowing delivery of

knowingly inaccurate reports concerning a commodities market by certain former WPC

employees (the "Investigation").

    1.    WPC accepts and acknowledges that, if it commits a willful and knowingly

material breach of the terms and conditions of this Agreement, the Fraud Section and/or USAO

NDCal may file a criminal complaint in the appropriate United States District Court charging

WPC with knowingly delivering knowingly inaccurate reports concerning the commodities

market for natural gas, in violation of Title 7, United States Code, Section 13(a)(2).

    2.    WPC acknowledges that the Fraud Section and USAO NDCal have developed

information during the Investigation that certain former WPC employees submitted inaccurate

information to natural gas industry publications as set forth in the Statement of Facts attached

hereto as Annex A and incorporated herein by reference.  By entering into this Agreement and

by, among other things, the substantial remedial actions it has taken to date, its continuing

commitment of full cooperation as directed by the Fraud Section and USAO NDCal, its

agreement to pay substantial monetary fines, and the other undertakings it has made as set forth

herein, WPC accepts and acknowledges responsibility for the conduct of its former employees as

set forth in the Statement of Facts.  WPC agrees it will not contest the admissibility into evidence

of the Statement of Facts in any subsequent criminal proceedings occurring in the event of a breach of this Agreement.

3.    WPC expressly agrees that it shall not, through its present or future attorneys, board of directors, officers, or management employees, make public statements contradicting the Statement of Facts.  Should the Fraud Section and USAO NDCal decide in their sole discretion that a public statement by any such person contradicts the Statement of Facts and should be imputed to WPC for the purpose of determining whether WPC has breached this Agreement, they shall notify WPC and provide WPC with an opportunity to publicly correct such statement. WPC shall avoid a breach of this Agreement by publicly correcting such statement within 48 hours after such notification.  WPC agrees that in the event that future criminal proceedings were to be brought in accordance with Paragraphs 12 and/or 14 of this Agreement, WPC will not contest the admissibility of the Statement of Facts in any such proceeding.

4.    Consistent with WPC's obligations as set forth above, WPC and its parent company and affiliates, and its present and former officers, agents, and employees shall be permitted to raise and support defenses and/or assert and support affirmative claims in civil and regulatory proceedings relating to the matters set forth in the Statement of Facts.  Nothing stated in this Agreement is intended or shall operate as a waiver of WPC's rights under Federal Rule of Evidence 408.

5.    WPC agrees to cooperate fully with the Fraud Section, USAO NDCal, and with any other agency designated by the Fraud Section and/or USAO NDCal, regarding any matter about which WPC has knowledge.  WPC's agreement to cooperate shall extend until the completion of the Fraud Section and USAO NDCal's investigation of any criminal activity relating to false reporting concerning natural gas commodities, including any investigations or prosecutions of others.

6.  WPC agrees that its cooperation, as agreed to in Paragraph 5 above, shall include, but is not limited to, the following:

(a)  Completely and truthfully disclosing all information as may be requested by the Fraud Section and/or USAO NDCal with respect to the activities of WPC and its parent company and affiliates, and its present and former officers, agents, and employees, concerning all matters inquired into by the Fraud Section and/or USAO NDCal;

(b)  Assembling, organizing, and providing on request from the Fraud Section and/or USAO NDCal, all documents, records, or other tangible evidence in WPC's possession, custody, or control;

(c)  Not asserting a claim of attorney-client or work-product privilege as to any documents, information, or testimony requested by the Fraud Section and/or USAO NDCal related to internal factual investigations or contemporaneous advice given to WPC concerning the conduct at issue.  Notwithstanding the foregoing, nothing in this Section shall be considered a waiver of the attorney-client or attorney work product privileges with respect to the opinions of counsel, mental impressions of counsel, communications between counsel, or lawful advice of counsel, and WPC, its parent company and affiliates shall not be required to produce documents or other evidence with respect to such opinions, mental impressions, communications or advice. In making production of any such documents, WPC neither expressly nor implicitly waives its right to assert any privilege with respect to the produced documents or the subject matter thereof that is available under law against non-parties to this Agreement.

(d)  Using its best efforts to make available its employees to provide information and/or testimony as requested by the Fraud Section and/or USAO NDCal, including sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law

3

enforcement authorities. Cooperation under this Paragraph will include identification of witnesses who, to WPC's knowledge, may have material information regarding the matters under Investigation;

(e)     Using its best efforts to make available for interviews, or for testimony, present or former WPC officers, directors, and employees as requested by the Fraud Section and/or USAO NDCal;

(f)     Providing testimony and other information deemed necessary by the Fraud Section, USAO NDCal or a court to identify or establish the original location, authenticity, or other evidentiary foundation necessary to admit into evidence documents in any criminal or other proceeding as requested by the Fraud Section and/or USAO NDCal.

7.     WPC shall continue to comply with any currently in force written agreements between WPC and any other federal agency as long as any such agreements shall remain in effect.

8.     WPC agrees to pay $50,000,000 to the United States Treasury as a monetary penalty. WPC shall make such payments on the following terms: $20,000,000 within thirty (30) days of the date of the Agreement, and the remaining $30,000,000 to be paid on or before the one year anniversary of this Agreement. If WPC fails to fulfill its obligations to pay the penalty, WPC will not oppose entry of a monetary judgment against it for the unpaid amount. WPC also will not resist collection efforts by the Fraud Section and USAO NDCal.

9.     In light of WPC's remedial actions to date and its willingness to (i) acknowledge responsibility for the conduct of its employees; (ii) continue its cooperation with the Fraud Section, USAO NDCal and other governmental regulatory agencies; (iii) demonstrate its future good conduct and full compliance with the commodities trading laws and generally accepted

4

accounting procedures; and (iv) consent to payment of the monetary penalty set forth in Paragraph 8 above, the Fraud Section and USAO NDCal shall defer any prosecution of WPC pursuant to Paragraph 1.

10.    The Fraud Section and USAO NDCal agree that if WPC has not committed a willful and knowingly material breach of this Agreement for fifteen (15) months from the date of the Agreement, this Agreement shall expire and no criminal prosecution of WPC for matters discussed in this Agreement will be instituted by the Fraud Section or the USAO NDCal. Should the Fraud Section or USAO NDCal determine during the term of this Agreement that WPC has committed any federal crime commenced subsequent to the date of this Agreement, WPC shall, in the sole discretion of the Fraud Section or USAO NDCal, thereafter be subject to prosecution for any federal crimes of which the Fraud Section and/or USAO NDCal have knowledge.

11.    Except in the event of a breach of this Agreement, all investigations relating to the matters set forth in the Statement of Facts that have been, or could have been, conducted by the Fraud Section and USAO NDCal prior to the date of this Agreement shall not be pursued further as to WPC or its parent company and affiliates. The Fraud Section and the USAO NDCal represent that they are aware of no other investigations relating to submission of false, inaccurate, or altered trade data by WPC or its parent company and affiliates as described in the Statement of Facts or to any criminal activities arising from such false, inaccurate, or altered reporting as of the signing of this Agreement.

12.    Should the Fraud Section and USAO NDCal determine that WPC has committed a willful and knowingly material breach of any provision of this Agreement, the Fraud Section and USAO NDCal shall provide written notice to WPC of the alleged breach, and provide WPC with a two-week period in which to request to make a presentation to the Assistant Attorney

General in charge of the Criminal Division to demonstrate that no breach has occurred, or, to the extent applicable, that the breach is not willful or knowingly material or has been cured. The parties hereto expressly understand and agree that should WPC fail to request an audience with the Assistant Attorney General in charge of the Criminal Division within a two-week period of the potential breach, it shall be conclusively presumed that WPC is in willful and material breach of this Agreement. The parties further understand and agree that the Assistant Attorney General's exercise of discretion under this paragraph is not subject to review in any court or tribunal outside of the Criminal Division of the Department of Justice. In the event of a breach of this Agreement that results in a prosecution of WPC, such prosecution may be premised upon any information provided by or on behalf of WPC to Fraud Section and/or USAO NDCal or other government agency at any time, unless otherwise agreed when the information was provided. The Fraud Section and the USAO NDCal agree, however, to recommend to the Court that the amount paid pursuant to this Agreement should be offset against whatever fine the Court shall impose as part of its judgment in the event of a subsequent prosecution.

13.    WPC shall expressly waive all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Northern District of California for the period that this Agreement is in effect.

14.    In case of the willful and knowingly material breach of this Agreement, any prosecution of WPC relating to the false reporting of trade data to industry publications or any crime arising therefrom that is not time-barred by the applicable statute of limitations as of the date of this Agreement may be commenced against WPC notwithstanding the expiration of any

applicable statute of limitations during the deferred prosecution period and up to the determination of any such willful and knowingly material breach. WPC's waiver of the statute of limitations is knowing and voluntary and in express reliance on the advice of counsel.

15.    WPC agrees that, if it sells or merges all or substantially all of its business operations as they exist as of the date of this Agreement to or into a single purchaser or group of affiliated purchasers during the term of this Agreement, it shall include in any contract for sale or merger a provision binding the purchaser/successor to the obligations described in this Agreement.

16.    It is understood that this Agreement is binding on WPC, the Fraud Section and USAO NDCal, but specifically does not bind any other federal agencies, or any state or local law enforcement or licensing authorities, although the Fraud Section and USAO NDCal will bring the cooperation of WPC and its compliance with its other obligations under this Agreement to the attention of other federal agencies, state and local law enforcement, or licensing authorities, if requested by WPC or its attorneys. It is understood that this Agreement also excludes any natural persons. It is the intent of the parties to this Agreement that the Agreement does not confer or provide any benefits, privileges or rights to any individuals or other entities other than the parties hereto, and that nothing in the Agreement shall be admissible in any proceeding other than a proceeding brought by the Fraud Section or the USAO NDCal. Moreover, WPC may raise defenses and/or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not otherwise violate any term of this Agreement.

17.    WPC, the Fraud Section and USAO NDCal agree that this Agreement may be publicly disclosed.

7

18.    This Agreement sets forth all the terms of the agreement between WPC, the Fraud Section and USAO NDCal. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section, the USAO NDCal, WPC's attorneys, and a duly authorized representative of WPC.

**On Behalf of the United States Department of Justice Fraud Section:**



———————————             ——————————————————————
DATE                                       PAUL E. PELLETIER
                                               Acting Chief, Fraud Section
                                               Criminal Division
                                               United States Department of Justice


                                               ROBERTSON T. PARK
                                               Assistant Chief, Fraud Section
                                               Criminal Division
                                               United States Department of Justice


                                               AMANDA L. RIEDEL
                                               Trial Attorney, Fraud Section
                                               Criminal Division
                                               United States Department of Justice


——————————————————————————————DATE
KEVIN V. RYAN
United States Attorney
Northern District of California

                        KESLIE STEWART
                        Assistant United States Attorney
                        Northern District of California

**On Behalf of WPC:**
2-21-06
———————————             ——————————————————————
DATE                                       Williams Power Company, Inc.

8

## ANNEX A:
## STATEMENT OF FACTS

For purposes of resolving a criminal investigation by the United States Department of Justice Fraud Section ("Fraud Section") and the United States Attorney's Office for the Northern District of California ("USAO NDCal") into the knowing delivery of knowingly inaccurate reports concerning a commodities market by certain WPC employees (the "Investigation"), the following statement of facts is set forth:

1.    Williams Power Company, Inc. ("WPC") is a Delaware corporation headquartered in Tulsa, Oklahoma. It is a separately incorporated, wholly-owned subsidiary of The Williams Companies, Inc. ("Williams"). WPC traded and marketed natural gas and related products and services.

2.    WPC divided its natural gas traders into groups, referred to as desks. Some of the desks corresponded with geographic regions of the United States: the East, Mid-Continent and West. WPC also established other trading desks, including Forward Trading desks, for trading natural gas futures, options contracts, and other instruments related to, among other things, the New York Mercantile Exchange, a primary forum for energy trading. The desks traded a variety of physical and financial instruments, including fixed-price physical natural gas, derivatives, swaps, index-based, over-the-counter, and physical contracts. Each desk was staffed by several traders.

3.    Certain WPC natural gas traders entered data regarding trades they made into spreadsheets that in turn were delivered to trade publications. These trade publications generated market price indices for natural gas at various delivery points, or "hubs," based in part on information received from industry participants. Natural gas traders used the published indices

1

to price and settle certain physical and over-the-counter financial derivative natural gas transactions.

4.    *Inside FERC* ("*IFERC*") Gas Market Report, a publication of Platts, a McGraw-Hill company, publishes market price indices for natural gas at various delivery points, or "hubs," based in part on information received from industry participants. From at least June 1, 1998, through approximately October 31, 2002, certain WPC employees submitted data to *IFERC* regarding natural gas trades, while acting within the course and scope of their employment. *IFERC* editors exercised judgment and attempted to exclude numbers that diverged from the majority of trades at a given hub. WPC does not contest that misrepresenting either the prices or volumes reported to *IFERC* could alter the published *IFERC* index prices.

5.    From on or about June 1, 1998, through on or about October 31, 2002, certain WPC employees submitted inaccurate reports to *IFERC* regarding trades of natural gas entered into by WPC during bid week, the last several business days of the month during which trades for gas flowing the following month were executed.

6.    From approximately June 1, 1998, through approximately October 31, 2002, to benefit WPC's gas trading positions, certain WPC employees submitted trade data to *IFERC* for WPC's East and West desks which contained knowingly inaccurate data, including incorrect volume and/or prices, fictitious trades or incomplete reports of actual trades. Certain WPC employees, on limited occasions, also attempted to conceal the falsity of these submissions by providing misleading and inaccurate information to *IFERC* employees who contacted them to confirm reported trade information.

7.    In approximately October 2002, when media reports exposed false reporting by traders at another energy company, WPC's management discovered the above-described conduct

2

and reported this information to the Commodity Futures Trading Commission ("CFTC"). WPC

has cooperated with the CFTC's inquiry into possible inaccurate reporting by WPC, its current

and former employees, and with the Investigation.

8.    There are other matters known to the parties that are not included in this statement

of facts.

3